"EXHIBIT 1"

Recording Requested By:

Diversified

Return To:
FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA 92834-34078

15517

Prepared By:
BARBARA LICON

1000275900

RECORDED AT THE REQUEST OF
DIVERSIFIED TITLE & ESCROW
SERVICES COMPANY

DOC # 2005-0787005

SEP 12, 2005     4:59 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:              78.00
PAGES:            24          DA:          1

2005-0787005

———— [Space Above This Line For Recording Data] ————

# DEED OF TRUST

MIN 1001944-1000275900-4

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **September 7, 2005** together with all Riders to this document.
(B) "Borrower" is JAMES L. RAMPP AND CHAUNTELY M. RAMPP, HUSBAND AND WIFE, AS COMMUNITY PROPERTY

Borrower's address is 2421 PRIMROSE AVENUE   , VISTA, CA 92083
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is   FREMONT INVESTMENT & LOAN

Lender is a   CORPORATION
organized and existing under the laws of   CALIFORNIA

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS   Form 3005 1/01

-6A(CA) (0207)
Page 1 of 15             Initials

VMP MORTGAGE FORMS - (800)521-7291



15518

Lender's address is
2727 EAST IMPERIAL HIGHWAY, BREA CA 92821
(D) "Trustee" is  FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated  September 7, 2005
The Note states that Borrower owes Lender Four Hundred Thousand and No/100 ---------
                                                                                                                    Dollars
(U.S. $     400,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than     October 1, 2035
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(CA) (0207)                                          Page 2 of 16                          Initials: _____ / _____          Form 3005  1/01

15519

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County**                                  of **SAN DIEGO**                                            :

[Type of Recording Jurisdiction]                        [Name of Recording Jurisdiction]

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.**

Parcel ID Number:     **176-120-44-00**                     which currently has the address of
**244 AVALON DR**                                                         [Street]
**VISTA**                                            [City], California **92084**            [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207)                          Page 3 of 15          Initials: *JJR /CMR*          Form 3005  1/01

15520

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

15521

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

15522

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: *JFM/CMR*

-6A(CA) (0207)                   Page 6 of 15                   Form 3005  1/01

15523

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _____

Form 3005  1/01

15524

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

Initials: *J J R / C M R*

15525

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

Initials: _JKK / CMR_

15526

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict

-8A(CA) (0207)                     Page 10 of 15                    Initials: _____ /CMR        Form 3005  1/01

15527

shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: _____

Form 3005  1/01

15528

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0207)                                       Page 12 of 15                Initials: _____ /CMR                Form 3005  1/01

15529

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: _JM_/_CMR_

15530

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
CHAUNTEL M. RAMPP                    -Borrower

_____

_____ (Seal)
JAMES L. RAMPP                       -Borrower

_____ (Seal)         _____ (Seal)
            -Borrower                                   -Borrower

_____ (Seal)         _____ (Seal)
            -Borrower                                   -Borrower

_____ (Seal)         _____ (Seal)
            -Borrower                                   -Borrower

15531

State of California
County of San Diego } ss.

On 9-8-05 before me, Kara Loker, "notary Public" personally appeared

Chant* Chauntel M. Lampp and James L. Rampp

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ notary Public _____ (Seal)

exp. 05-12-06

KARA LOKER
Commission # 1356262
Notary Public - California
San Diego County
My Comm. Expires May 12, 2008

DIVERSIFIED TITLE & ESCROW SERVICES COMPANY

**15532**

Order Number: M5314519-24

Exhibit "A"

PARCEL 1:

PARCEL "C" OF PARCEL MAP NO. 6650, IN THE CITY OF VISTA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY DECEMBER 15, 1977 AS FILE NO. 77-518538 OF OFFICIAL RECORDS.

PARCEL 2:

EASEMENTS AND RIGHTS OF WAY FOR INGRESS AND EGRESS FOR ROAD PURPOSES, TO BE USED IN COMMON WITH OWNERS OF LOTS 173 AND 174 OF ORLEAVO HEIGHTS UNIT NO. 4, IN THE CITY OF VISTA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 2125, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY AUGUST 7, 1925, BEING MORE PARTICULARLY DESCRIBED UNDER PARCELS A, B, C AND D BELOW:

EASEMENT PARCEL A:

A STRIP OF LAND 40.00 FEET IN WIDTH, THE CENTERLINE OF WHICH BEING DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE COMMON LINE BETWEEN LOTS 173 AND 174 OF SAID ORLEAVO HEIGHTS UNIT NO. 4, WHICH IS DISTANT THEREALONG NORTH 15°20'00" EAST, 194.60 FEET FROM THE SOUTHERLY COMMON CORNER OF SAID LOTS; THENCE NORTH 84°42'00" WEST, 158.49 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 84°42'00" EAST, 266.07 FEET TO THE BEGINNING OF A TANGENT 255.00 FOOT RADIUS CURVE, CONCAVE NORTHERLY; THENCE EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 31°40'00" A DISTANCE OF 140.94 FEET; THENCE TANGENT TO SAID CURVE NORTH 63°38'00" EAST, 172.52 FEET TO THE NORTHEASTERLY LINE OF SAID LOT 174, THE SIDE LINES OF SAID 40.00 FOOT STRIP BEING PROLONGED OR SHORTENED TO TERMINATE IN SAID NORTHEASTERLY LOT LINE.

EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL 1 ABOVE DESCRIBED.

5

EASEMENT PARCEL B:

THAT PORTION OF LOT 174, DESCRIBED AS FOLLOWS:

15533

COMMENCING AT A POINT IN THE COMMON LINE BETWEEN SAID LOTS 173 AND 174, DISTANT THEREALONG NORTH 15°20'00" EAST, 393.48 FEET FROM THE SOUTHERLY COMMON CORNER OF SAID LOTS 173 AND 174; THENCE NORTH 55°00'00" EAST, 272.71 FEET TO AN INTERSECTION WITH A LINE WHICH IS PARALLEL WITH 30.00 FEET SOUTHWESTERLY AT RIGHT ANGLES FROM THE NORTHEASTERLY LINE OF SAID LOT 174, SAID INTERSECTION BEING THE TRUE POINT OF BEGINNING OF EASEMENT PARCEL B HEREIN DESCRIBED; THENCE ALONG SAID PARALLEL LINE SOUTH 19°30'00" EAST, 239.99 FEET TO THE BEGINNING OF A TANGENT 29.32 FOOT RADIUS CURVE, CONCAVE WESTERLY; THENCE SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 83°08'00" A DISTANCE OF 42.54 FEET TO THE NORTHWESTERLY LINE OF SAID EASEMENT PARCEL A ABOVE DESCRIBED; THENCE ALONG SAID NORTHWESTERLY LINE OF EASEMENT PARCEL A NORTH 63°38'00" EAST, 56.22 FEET TO THE MOST NORTHERLY CORNER OF SAID EASEMENT IN THE NORTHEASTERLY LINE OF SAID LOT 174; THENCE ALONG SAID NORTHEASTERLY LOT LINE, NORTH 19°30'00" WEST TO A LINE WHICH BEARS NORTH 55°00'00" EAST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 55°00'00" WEST, 31.14 FEET TO THE TRUE POINT OF BEGINNING.

EASEMENT PARCEL C:

THAT PORTION OF LOT 174, DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE COMMON LINE BETWEEN SAID LOTS 173 AND 174, DISTANT THEREALONG NORTH 15°20'00" EAST, 393.48 FEET FROM THE SOUTHERLY COMMON CORNER OF SAID LOTS 173 AND 174; THENCE NORTH 55°00'00" EAST, 283.10 FEET TO THE TRUE POINT OF BEGINNING OF EASEMENT PARCEL C HEREIN DESCRIBED; THENCE NORTH 19°30'00" WEST, 24.99 FEET; THENCE NORTH 40°30'00" EAST, 40.55 FEET MORE OR LESS, TO A POINT IN THE 200.00 FOOT RADIUS CURVE, (CONCAVE NORTHEASTERLY) OF THE NORTHEASTERLY LINE OF SAID LOT 174, FROM WHICH POINT, A LINE RADIAL TO SAID CURVE BEARS SOUTH 46°14'21" WEST; THENCE SOUTHEASTERLY ALONG SAID CURVE OF SAID NORTHEASTERLY LOT LINE 20.03 FEET TO THE MOST NORTHERLY COMMON CORNER BETWEEN LOTS 174 AND 175 OF ORLEAVO HEIGHTS UNIT NO. 4; THENCE ALONG THE EASTERLY BOUNDARY OF SAID LOT 174, SOUTH 40°30'00" WEST, 28.00 FEET AND SOUTH 19°30'00" EAST TO A LINE WHICH BEARS NORTH 55°00'00" EAST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 55°00'00" WEST, 20.75 FEET TO THE TRUE POINT OF BEGINNING.

6

15534

**EASEMENT PARCEL D:**

THAT PORTION OF LOTS 173 AND 174 OF ORLEAVO HEIGHT UNIT NO. 4, MAP NO. 2125, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHERLY COMMON CORNER OF SAID LOTS 173 AND 174; THENCE ALONG THE SOUTHERLY LINE OF SAID LOT 174, SOUTH 85°30'00" EAST, 26.00 FEET; THENCE PARALLEL WITH THE LINE COMMON TO SAID LOTS, NORTH 15°20'00" EAST, 157.14 FEET TO A POINT OF TANGENCY WITH A 20.00 FOOT RADIUS CIRCLE LYING EASTERLY OF THE LAST NAMED COURSE, AND SOUTHERLY OF AND TANGENT TO THE SOUTHEASTERLY LINE OF SAID EASEMENT PARCEL 2A ABOVE DESCRIBED; THENCE NORTHEASTERLY ALONG THE CURVE OF SAID CIRCLE THROUGH A CENTRAL ANGLE OF 79°58'00" A DISTANCE OF 27.91 FEET TO SAID POINT OF TANGENCY WITH SAID SOUTHERLY LINE OF EASEMENT PARCEL A; THENCE ALONG SAID SOUTHERLY LINE OF EASEMENT PARCEL A NORTH 84°42'00" WEST, 66.61 FEET, MORE OR LESS, TO A POINT OF TANGENCY WITH A SECOND 20.00 FOOT RADIUS CIRCLE LYING SOUTHERLY OF SAID SOUTHERLY BOUNDARY OF SAID EASEMENT PARCEL A AND WESTERLY OF AND TANGENT TO SAID LINE COMMON TO SAID LOTS 173 AND 174; THENCE SOUTHEASTERLY ALONG THE CURVE OF SAID CIRCLE THROUGH A CENTRAL ANGLE OF 100°02'00" A DISTANCE OF 34.92 FEET TO SAID LINE COMMON TO SAID LOTS 173 AND 174; THENCE ALONG SAID COMMON LOT LINE SOUTH 15°20'00" WEST, 150.45 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION THEREOF LYING WITHIN PARCEL MAP NO. 6650.

**PARCEL 3:**

AN EASEMENT FOR ROAD AND UTILITY PURPOSES OVER, UNDER, ALONG AND ACROSS A STRIP OF LAND LYING WITHIN PARCELS A, B AND C OF PARCEL MAP NO. 6650, IN THE CITY OF VISTA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY DECEMBER 15, 1977, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID PARCEL MAP NO. 6650; THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL MAP NORTH 68°08'57" WEST 25.70 FEET TO THE MOST WESTERLY CORNER THEREIN; THENCE ALONG THE WESTERLY LINE OF SAID PARCEL MAP, NORTH 15°20'00" EAST, 506.05 FEET TO AN ANGLE POINT THEREIN; THENCE ALONG THE NORTHERLY LINE OF SAID PARCEL MAP AND THE EASTERLY PROLONGATION THEREOF, SOUTH 85°29'26" EAST, 229.30 FEET; THENCE SOUTH 46°30'00" WEST, 34.44 FEET; THENCE NORTH

85°29'26" WEST, 185.16 FEET; THENCE SOUTH 15°20'00" WEST, 487.80 FEET TO THE
TRUE POINT OF BEGINNING.                                                15535

EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL 1 HEREINABOVE
DESCRIBED.

15536

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this **7th** day of **September** **2005**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
**244 AVALON DRIVE    VISTA, CA 92084**

[Property Address]

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES IN THE INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE INTEREST RATE WILL RESULT IN LOWER PAYMENTS.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **7.950** %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The interest rate I will pay may change on the **first** day of **October** **2007**, and on that day every **sixth** month thereafter. Each date on which my interest rate could change is called a "Change Date."

MULTISTATE ADJUSTABLE RATE RIDER - Single Family

VMP-899R (0402)            1/01
Page 1 of 5        Initials: _AR_ /CMR
VMP Mortgage Solutions, Inc.
(800)521-7291

15537

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is:
the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the WALL STREET JOURNAL. The most recent Index figure available as of the date: ☒ 45 days ☐ _____ before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and Six Hundred Seventy-Three Thousandths** percentage points ( **6.6737** %) to the Current Index. The Note Holder will then round the result of this addition to the ☒ Nearest ☐ Next Highest ☐ Next Lowest **One-Eighth** ( **0.125** %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

☐ **Interest-Only Period**
The "Interest-only Period" is the period from the date of this Note through **N/A**. For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.
The "Amortization Period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

VMP-899R (0402)                    Page 2 of 5                    Initials: _JTL_ / _CMR_

15538

**(D) Limits on Interest Rate Changes**
**(Please check appropriate boxes; if no box is checked, there will be no maximum limit on changes.)**

☐ (1) There will be no maximum limit on interest rate changes.
☒ (2) The interest rate I am required to pay at the first Change Date will not be greater than   9.950       % or less than   7.9500   %.
☒ (3) My interest rate will never be increased or decreased on any single Change Date by more than   One and One-Half
percentage points (        1.5000        %) from the rate of interest I have been paying for the preceding period.
☒ (4) My interest rate will never be greater than   13.9500        %, which is called the "Maximum Rate."
☒ (5) My interest rate will never be less than        7.9500    %, which is called the "Minimum Rate."
☒ (6) My interest rate will never be less than the initial interest rate.
☒ (7) The interest rate I am required to pay at the first Change Date will not be greater than   9.950       % or less than   7.9500         %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   One and One-Half
percentage points (        1.5000        %) from the rate of interest I have been paying for the preceding period.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Initials: _JSL /CMR_

15539

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

-899R (0402)                          Page 4 of 5                  Initials: _JZR_ /CMK_

15540

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
CHAUNTEL M. RAMPP            -Borrower       JAMES L. RAMPP              -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                             -Borrower                                  -Borrower

VMP-899R (0402)                    Page 5 of 5

4120

INTEREST START DATE 9/1/05

# ADJUSTABLE RATE NOTE
### (6-Month LIBOR Index - Rate Caps)
### (Assumable during Life of Loan) (First Business Day of Preceding Month Lookback)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

September 7, 2005                     BREA, CA 92821
　　[Date]　　　　　　　　　　　　　　　　[City]　　　　　　　　　　　　　　[State]

244 AVALON DRIVE   VISTA, CA 92084

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 400,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is FREMONT INVESTMENT & LOAN

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.950 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on **November 1, 2005**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **October 1, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2727 EAST IMPERIAL HIGHWAY, BREA CA 92821

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 2,921.13. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index (Assumable during Life of Loan) (First Business Day Lookback) - Single Family - Freddie Mac UNIFORM INSTRUMENT

VMP®-815N (0404)                     Form 5520 3/04
　　VMP Mortgage Solutions (800) 521-7291
Page 1 of 4                          Initials: AA / CMR



**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)   Change Dates**

The interest rate I will pay may change on the first day of **October 1, 2007**              , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B)   The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available 45 days before each Change Date is called the "Current Index.'

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)   Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding       **Six and Six Hundred Seventy-Three Thousandths**   percentage points (     **6.6737**        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than      **9.950**           % or less than   **7.9500**       %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than **1.5000**            from the rate of interest I have been paying for the preceding period. My interest rate will never be greater than      **13.9500**         % or less than   **7.9500**      %.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

**∗SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF∗**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will he  6.0 ·            % of any overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Form 5520 3/04
Initials: _____ /CHR

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**\*SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF\***

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
CHAUNTEL M. RAMPP                -Borrower     JAMES L. RAMPP                   -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                     -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                     -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                     -Borrower

*[Sign Original Only]*

-815N (0404)                    Page 4 of 4                      Form 5520 3/04

Pay to the order of

HSBC Bank Usa, National Association, As Trustee For The
Benefit Of The Certificateholders of Nomura Home Equity
Loan, Inc. Asset-Backed Certificates, Series 2008-FM1

without recourse.

Fremont Investment & Loan
Michael Koch
Vice President

## PREPAYMENT RIDER TO NOTE

This Prepayment Rider is made this 7th          day of      September, 2005     , and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note ("Note") made by the undersigned (the "Borrower") to

FREMONT INVESTMENT & LOAN

(the "Lender") of the same date and covering the property located at:

244 AVALON DRIVE    VISTA, CA 92084

(Property Address)

## BORROWER'S RIGHT TO PREPAY
This Prepayment Rider Supersedes Section 5 of the Note

I have the right to make payments of principal at any time before they are due.  A payment of principal only is known as a "prepayment."   When I make a prepayment, I will tell the Note Holder in a letter that I am doing so.  A prepayment of all of the unpaid principal is known as a "full prepayment."   A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full or partial prepayment; however, the Note Holder may charge me for the privilege of prepayment.  If more than 20% of the original principal amount of this note is prepaid in any 12-month period within  2         years after the date of this loan, I agree to pay a prepayment charge equal to six months interest on the amount prepaid which is in excess of 20% of the original principal amount of this Note.  If I make prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes.  I may make full prepayment at any time.

_Chauntel M. Rampp_ 09/08/05          _James L. Rampp_ 9-08-05
CHAUNTEL M. RAMPP       Date           JAMES L. RAMPP       Date

_____          _____
                        Date                                 Date

MSPPY1 XTG 10/28/04

"EXHIBIT 2"

Recording Requested By:
Diversified

*(handwritten)* QP 15541

DOC.#    2005-0787006

SEP 12, 2005     4:59 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:       63.00
PAGES:      19     DA:    1

2005-0787006

Return To:
FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA 92834-34078

Prepared By:
BARBARA LICON

*(vertical left margin)* RECORDED AT THE REQUEST OF DIVERSIFIED TITLE & ESCROW SERVICES COMPANY

1000275903

531451924

[Space Above This Line For Recording Data]

# DEED OF TRUST

MIN 1001944-1000275903-8

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **September 7, 2005** ,
together with all Riders to this document.
(B) "Borrower" is JAMES L. RAMPP AND CHAUNTELE M. RAMPP, HUSBAND AND WIFE, AS COMMUNITY PROPERTY

Borrower's address is 2421 PRIMROSE AVENUE , VISTA, CA 92083
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is FREMONT INVESTMENT & LOAN

Lender is a CORPORATION
organized and existing under the laws of CALIFORNIA

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS   Form 3005 1/01

VMP -6A(CA) (0207)
Page 1 of 15      Initials:
VMP MORTGAGE FORMS - (800)521-7291

SECOND MORTGAGE     This Deed of Trust is second and subordinate to the first being recorded concurrently herewith.

**15542**

Lender's address is
2727 EAST IMPERIAL HIGHWAY, BREA CA 92821
(D) "Trustee" is   FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated   September 7, 2005
The Note states that Borrower owes Lender One Hundred Thousand and No/100 ----------
----------------------------------------------------------------------------------------- Dollars
(U.S. $    100,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   October 1, 2035

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: *PJR / CMR*

-6A(CA) (0207)                      Page 2 of 15                      Form 3005   1/01

15543

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **SAN DIEGO** :

[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

Parcel ID Number:   **176-120-44-00**                  which currently has the address of
**244 AVALON DR**                                                                [Street]
**VISTA**                                          [City], California **92084**      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207)                    Page 3 of 15          Initialed JJR/CMR      Form 3005 1/01

15544

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

15545

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

15546

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: _____

15547

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0207)  Page 7 of 15  Form 3005 1/01

**15548**

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

15549

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

15550

any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

  **13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

  Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

  **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

  If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

  **15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

  **16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict

Initials: _____

15551

shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

**15552**

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(CA) (0207)          Page 12 of 15          Initials:          Form 3005  1/01

15553

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0207)                     Page 13 of 15                     Initials: _____     Form 3005   1/01

15554

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _Chauntel M Rampp_____ (Seal)
                                    CHAUNTEL M. RAMPP              -Borrower


_____          _James L Rampp_____ (Seal)
                                    JAMES L. RAMPP                -Borrower


_____ (Seal)   _____ (Seal)
                 -Borrower                           -Borrower


_____ (Seal)   _____ (Seal)
                 -Borrower                           -Borrower


_____ (Seal)   _____ (Seal)
                 -Borrower                           -Borrower

15555

State of California
County of *San Diego*          } ss.

On     *9-8-05*          before me,   *Kara Loker "notary public"*

                                                    personally appeared

*Chauntel M. Rampp and James L. Rampp*

                                                    , personally known to me

(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

                                        *Kara Lok notary public*          (Seal)
                                            *exp.05-12-06*

KARA LOKER
Commission # 1358262
Notary Public - California
San Diego County
My Comm. Expires May 12, 2006

-6A(CA) (0207)          Page 15 of 15          Initials *JLR/CMR*          Form 3005  1/01

# DIVERSIFIED TITLE & ESCROW SERVICES COMPANY

Order Number: M5314519-24

**15556**

## Exhibit "A"

**PARCEL 1:**

PARCEL "C" OF PARCEL MAP NO. 6650, IN THE CITY OF VISTA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY DECEMBER 15, 1977 AS FILE NO. 77-518538 OF OFFICIAL RECORDS.

**PARCEL 2:**

EASEMENTS AND RIGHTS OF WAY FOR INGRESS AND EGRESS FOR ROAD PURPOSES, TO BE USED IN COMMON WITH OWNERS OF LOTS 173 AND 174 OF ORLEAVO HEIGHTS UNIT NO. 4, IN THE CITY OF VISTA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 2125, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY AUGUST 7, 1925, BEING MORE PARTICULARLY DESCRIBED UNDER PARCELS A, B, C AND D BELOW:

**EASEMENT PARCEL A:**

A STRIP OF LAND 40.00 FEET IN WIDTH, THE CENTERLINE OF WHICH BEING DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE COMMON LINE BETWEEN LOTS 173 AND 174 OF SAID ORLEAVO HEIGHTS UNIT NO. 4, WHICH IS DISTANT THEREALONG NORTH 15°20'00" EAST, 194.60 FEET FROM THE SOUTHERLY COMMON CORNER OF SAID LOTS; THENCE NORTH 84°42'00" WEST, 158.49 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 84°42'00" EAST, 266.07 FEET TO THE BEGINNING OF A TANGENT 255.00 FOOT RADIUS CURVE, CONCAVE NORTHERLY; THENCE EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 31°40'00" A DISTANCE OF 140.94 FEET; THENCE TANGENT TO SAID CURVE NORTH 63°38'00" EAST, 172.52 FEET TO THE NORTHEASTERLY LINE OF SAID LOT 174, THE SIDE LINES OF SAID 40.00 FOOT STRIP BEING PROLONGED OR SHORTENED TO TERMINATE IN SAID NORTHEASTERLY LOT LINE.

EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL 1 ABOVE DESCRIBED.

5

**EASEMENT PARCEL B:**                                    15557

THAT PORTION OF LOT 174, DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE COMMON LINE BETWEEN SAID LOTS 173 AND 174, DISTANT THEREALONG NORTH 15°20'00" EAST, 393.48 FEET FROM THE SOUTHERLY COMMON CORNER OF SAID LOTS 173 AND 174; THENCE NORTH 55°00'00" EAST, 272.71 FEET TO AN INTERSECTION WITH A LINE WHICH IS PARALLEL WITH 30.00 FEET SOUTHWESTERLY AT RIGHT ANGLES FROM THE NORTHEASTERLY LINE OF SAID LOT 174, SAID INTERSECTION BEING THE TRUE POINT OF BEGINNING OF EASEMENT PARCEL B HEREIN DESCRIBED; THENCE ALONG SAID PARALLEL LINE SOUTH 19°30'00" EAST, 239.99 FEET TO THE BEGINNING OF A TANGENT 29.32 FOOT RADIUS CURVE, CONCAVE WESTERLY; THENCE SOUTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 83°08'00" A DISTANCE OF 42.54 FEET TO THE NORTHWESTERLY LINE OF SAID EASEMENT PARCEL A ABOVE DESCRIBED; THENCE ALONG SAID NORTHWESTERLY LINE OF EASEMENT PARCEL A NORTH 63°38'00" EAST, 56.22 FEET TO THE MOST NORTHERLY CORNER OF SAID EASEMENT IN THE NORTHEASTERLY LINE OF SAID LOT 174; THENCE ALONG SAID NORTHEASTERLY LOT LINE, NORTH 19°30'00" WEST TO A LINE WHICH BEARS NORTH 55°00'00" EAST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 55°00'00" WEST, 31.14 FEET TO THE TRUE POINT OF BEGINNING.

**EASEMENT PARCEL C:**

THAT PORTION OF LOT 174, DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE COMMON LINE BETWEEN SAID LOTS 173 AND 174, DISTANT THEREALONG NORTH 15°20'00" EAST, 393.48 FEET FROM THE SOUTHERLY COMMON CORNER OF SAID LOTS 173 AND 174; THENCE NORTH 55°00'00" EAST, 283.10 FEET TO THE TRUE POINT OF BEGINNING OF EASEMENT PARCEL C HEREIN DESCRIBED; THENCE NORTH 19°30'00" WEST, 24.99 FEET; THENCE NORTH 40°30'00" EAST, 40.55 FEET MORE OR LESS, TO A POINT IN THE 200.00 FOOT RADIUS CURVE, (CONCAVE NORTHEASTERLY) OF THE NORTHEASTERLY LINE OF SAID LOT 174, FROM WHICH POINT, A LINE RADIAL TO SAID CURVE BEARS SOUTH 46°14'21" WEST; THENCE SOUTHEASTERLY ALONG SAID CURVE OF SAID NORTHEASTERLY LOT LINE 20.03 FEET TO THE MOST NORTHERLY COMMON CORNER BETWEEN LOTS 174 AND 175 OF ORLEAVO HEIGHTS UNIT NO. 4; THENCE ALONG THE EASTERLY BOUNDARY OF SAID LOT 174, SOUTH 40°30'00" WEST, 28.00 FEET AND SOUTH 19°30'00" EAST TO A LINE WHICH BEARS NORTH 55°00'00" EAST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 55°00'00" WEST, 20.75 FEET TO THE TRUE POINT OF BEGINNING.

15558

EASEMENT PARCEL D:

THAT PORTION OF LOTS 173 AND 174 OF ORLEAVO HEIGHT UNIT NO. 4, MAP NO. 2125, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHERLY COMMON CORNER OF SAID LOTS 173 AND 174; THENCE ALONG THE SOUTHERLY LINE OF SAID LOT 174, SOUTH 85°30'00" EAST, 26.00 FEET; THENCE PARALLEL WITH THE LINE COMMON TO SAID LOTS, NORTH 15°20'00" EAST, 157.14 FEET TO A POINT OF TANGENCY WITH A 20.00 FOOT RADIUS CIRCLE LYING EASTERLY OF THE LAST NAMED COURSE, AND SOUTHERLY OF AND TANGENT TO THE SOUTHEASTERLY LINE OF SAID EASEMENT PARCEL 2A ABOVE DESCRIBED; THENCE NORTHEASTERLY ALONG THE CURVE OF SAID CIRCLE THROUGH A CENTRAL ANGLE OF 79°58'00" A DISTANCE OF 27.91 FEET TO SAID POINT OF TANGENCY WITH SAID SOUTHERLY LINE OF EASEMENT PARCEL A; THENCE ALONG SAID SOUTHERLY LINE OF EASEMENT PARCEL A NORTH 84°42'00" WEST, 66.61 FEET, MORE OR LESS, TO A POINT OF TANGENCY WITH A SECOND 20.00 FOOT RADIUS CIRCLE LYING SOUTHERLY OF SAID SOUTHERLY BOUNDARY OF SAID EASEMENT PARCEL A AND WESTERLY OF AND TANGENT TO SAID LINE COMMON TO SAID LOTS 173 AND 174; THENCE SOUTHEASTERLY ALONG THE CURVE OF SAID CIRCLE THROUGH A CENTRAL ANGLE OF 100°02'00" A DISTANCE OF 34.92 FEET TO SAID LINE COMMON TO SAID LOTS 173 AND 174; THENCE ALONG SAID COMMON LOT LINE SOUTH 15°20'00" WEST, 150.45 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION THEREOF LYING WITHIN PARCEL MAP NO. 6650.

PARCEL 3:

AN EASEMENT FOR ROAD AND UTILITY PURPOSES OVER, UNDER, ALONG AND ACROSS A STRIP OF LAND LYING WITHIN PARCELS A, B AND C OF PARCEL MAP NO. 6650, IN THE CITY OF VISTA, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY DECEMBER 15, 1977, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID PARCEL MAP NO. 6650; THENCE ALONG THE SOUTHERLY LINE OF SAID PARCEL MAP NORTH 68°08'57" WEST 25.70 FEET TO THE MOST WESTERLY CORNER THEREIN; THENCE ALONG THE WESTERLY LINE OF SAID PARCEL MAP, NORTH 15°20'00" EAST, 506.05 FEET TO AN ANGLE POINT THEREIN; THENCE ALONG THE NORTHERLY LINE OF SAID PARCEL MAP AND THE EASTERLY PROLONGATION THEREOF, SOUTH 85°29'26" EAST, 229.30 FEET; THENCE SOUTH 46°30'00" WEST, 34.44 FEET; THENCE NORTH

15559

85°29'26" WEST, 185.16 FEET; THENCE SOUTH 15°20'00" WEST, 487.80 FEET TO THE
TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL 1 HEREINABOVE
DESCRIBED.

DOC # 2008-0143793

RECORDING REQUESTED BY
**Clinton F. Jones**
AND WHEN RECORDED MAIL, UNLESS OTHERWISE
SHOWN BELOW, MAIL TAX STATEMENTS TO:

JAMES L. RAMPP AND CHAUNTEL M. RAMPP
C/O CLINTON F. JONES
JONES, BARDEN & FINEGOLD, APC
16959 BERNARDO CENTER DRIVE
SUITE 102
SAN DIEGO, CALIFORNIA 92128

TITLE ORDER NO. _____ ESCROW NO. _____

9834

MAR 18, 2008        4:02 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:           9.00
DC:             DC

**PAGES:**    1

## Quitclaim Deed

APN# 176-120-44

THE UNDERSIGNED GRANTOR(S) DECLARE:
DOCUMENTARY TRANSFER TAX IS $   -0-  No Consideration
UNINCORPORATED AREA X CITY OF VISTA
PARCEL NO. 176-120-44
X COMPUTED ON FULL VALUE OF PROPERTY CONVEYED, OR
__ COMPUTED ON FULL VALUE LESS VALUE OF LIENS OR ENCUMBRANCES AT TIME OF SALE, AND

### FOR A VALUABLE CONSIDERATION, RECEIPT OF WHICH IS HEREBY ACKNOWLEDGED,

"JAMES L. RAMPP AND CHAUNTEL M. RAMPP, husband and wife, as community property with right of
survivorship"

HEREBY REMISE, RELEASE AND FOREVER QUITCLAIM TO

JAMES L. RAMPP AND CHAUNTEL M. RAMPP, TRUSTEES OF THE RAMPP FAMILY 2008 TRUST
DATED *March 12, 2008.*

THE FOLLOWING DESCRIBED REAL PROPERTY IN THE UNINCORPORATED AREA OF VISTA,   COUNTY OF SAN DIEGO,
STATE OF CALIFORNIA:

PARCEL "C" OF PARCEL MAP NO. 6650, IN THE CITY OF VISTA, COUNTY OF SAN DIEGO, STATE OF
CALIFORNIA, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, DECEMBER
15, 1977 AS FILE NO. 77-518538 OF OFFICIAL RECORDS.

AS MORE FULLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

ALSO KNOWN AS: 244 AVALON DRIVE. VISTA, CALIFORNIA, 92084

DATED: *March 12, 2008*

STATE OF CALIFORNIA       )
COUNTY OF SAN DIEGO       ) SS.

JAMES L. RAMPP

CHAUNTEL M. RAMPP

On this *12* day of *March* 2008, before me, CHRISTINA TAMAYO, a
Notary Public in and for said County and State, personally appeared JAMES L. RAMPP
and CHAUNTEL M. RAMPP, proved to me on the basis of satisfactory evidence to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signatures(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SIGNATURE _____
CHRISTINA TAMAYO

CHRISTINA TAMAYO
Commission # 1780487
Notary Public - California
San Diego County
My Comm. Expires Nov 17, 2011

(THIS AREA FOR OFFICIAL NOTARIAL SEAL)

MAIL TAX STATEMENTS TO PARTY SHOWN ON THE FOLLOWING LINE; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE

JAMES L. RAMPP AND CHAUNTEL M. RAMPP        244 AVALON DRIVE        VISTA CA 92084

"EXHIBIT 3"

RECORDING REQUESTED BY

**LSI Title Company (CA)**

Recording requested by:
Quality Loan Service Corp

When recorded mail to:
Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101

090046423

TS No.: CA-09-237690-BL

DOC #   2009-0029017

JAN 22, 2009    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:        14.00
                                    DA:        1
**PAGES:        2**

Space above this line for Recorder's use

Loan No.: 41036161

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL
## UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION.** You may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account (normally five business days prior to the date set for the sale of your property). No sale may be set until three months from the date this notice of default is recorded (which date of recordation appears on this notice). This amount is $18,956.41 as of 1/21/2009 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have the pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**Litton Loan Servicing LP**
**C/O Quality Loan Service Corp.**
**2141 5th Avenue**
**San Diego, CA 92101**
**619-645-7711**

2148

TS No.: CA-09-237690-BL
Loan No.: 41036161
Notice of Default and Election To Sell Under Deed of Trust

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN:  That the undersigned is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 9/7/2005, executed by JAMES L. RAMPP AND CHAUNTEL M. RAMPP, HUSBAND AND WIFE AS COMMUNITY PROPERTY, as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FREMONT INVESTMENT & LOAN, A CORPORATION, as beneficiary, recorded 9/12/2005, as Instrument No. 2005-0787005, in Book xxx, Page xxx of Official Records in the Office of the Recorder of  SAN DIEGO County, California describing land therein:  as more fully described in said Deed of Trust.

Said obligations including 1 NOTE(S) FOR THE ORIGINAL sum of $400,000.00, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of principal and interest plus impounds and advances which became due on 10/1/2008 plus amounts that are due or may become due for the following: late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustees fees, and any attorney fees and court costs arising from or associated with beneficiaries effort to protect and preserve its security must be cured as a condition of reinstatement.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The Beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code § 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of § 2923.5.

Dated: 1/21/2009

**Quality Loan Service Corp., AS AGENT FOR BENEFICIARY**
BY: LSI Title Company, as Agent

Merriyn L. Aguas

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holder's rights against the real property only.

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

"EXHIBIT 4"

RECORDING REQUESTED BY
**HALL SERVICE**

Recording requested by:

When recorded mail to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
619-645-7711

**8646**

DOC # 2009-0110177



MAR 05, 2009   3:45 PM

OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:        15.00

**PAGES:   3**

Space above this line for recorders use

TS # CA-09-237690-BL          Order # 090046423-CA-MAI          Loan # 41036161
MERS MIN No.:
100194410002759004

## Substitution of Trustee

WHEREAS, JAMES L. RAMPP AND CHAUNTEL M. RAMPP, HUSBAND AND WIFE AS COMMUNITY PROPERTY was the original Trustor, FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FREMONT INVESTMENT & LOAN, A CORPORATION was the original Beneficiary under that certain Deed of Trust dated 9/7/2005 and recorded on 9/12/2005 as Instrument No. 2005-0787005, in book xxx, page xxx of Official Records of SAN DIEGO County, CA; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and stead of said original Trustee, or Successor Trustee, thereunder, in the manner provided for in said Deed of Trust,

NOW, THEREFORE, the undersigned hereby substitutes QUALITY LOAN SERVICE CORPORATION ,as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Page 1

**8647**

Substitution of Trustee - CA
TS # CA-09-237690-BL
Page 2

Dated: 1/21/2009

HSBC Bank Usa, National Association, As Trustee For
The Benefit Of The Certificateholders Of Nomura Home
Equity Loan, Inc. Asset-Backed Certificates, Series 2006-
FM1

By: _____

Denise Bailey        Assistant Secretary

State of TX )
County of Harris )

LITTON LOAN SERVICING LP
ATTORNEY-IN-FACT

Brenda McKinzy                    & TX Drivers License

On ___1/29/09___ Date before me, _____ a notary public,  personally
appeared _____Denise Bailey_____ who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

BRENDA MCKINZY
Notary Public, State of Texas
My Commission Expires
December 05, 2010

3

.8648

## Affidavit of Mailing
## for Substitution of Trustee By Code

TS No.: **CA-09-237690-BL**
Trustor: JAMES L. RAMPP AND CHAUNTEL M. RAMPP, HUSBAND AND WIFE AS COMMUNITY PROPERTY

I, Laura Salas, declare: That I am an employee of **Quality Loan Service Corp.**, an agent for beneficiary, whose business address is:

> 2141 5th Avenue
> San Diego, CA 92101

I am over the age of eighteen years and in accordance with California Civil Code Section 2934, I caused a copy of the attached Substitution of Trustee to be mailed, in the manner provided in Section 2924(b) of the Civil Code of the State of California, to the trustee of record under the Deed of Trust described in said Substitution and to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said section.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Diego, CA on 2/5/2009.


Laura Salas

"EXHIBIT 5"

*RECORDING REQUESTED BY*
**HALL SERVICE**

Recording requested by:

When recorded mail to:

Litton Loan Servicing LP
4828 Loop Central Drive
Houston, TX 77081

10482

DOC # 2009-0110500

MAR 05, 2009    4:21 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
DAVID L. BUTLER, COUNTY RECORDER
FEES:          11.00

DA:        1

**PAGES:          1**

Space above this line for recorders use

TS # CA-09-237690-BL          Order # 090046423-CA-MAI          Loan # 41036161
MERS MIN No.:                                                   Investor No. 30001082
100194410002759004

## Assignment of Deed of Trust

For value received, the undersigned corporation hereby grants, assigns, and transfers to

**HSBC Bank Usa, National Association, As Trustee For The Benefit Of The Certificateholders Of Nomura Home Equity Loan, Inc. Asset-Backed Certificates, Series 2006-FM1**

all beneficial interest under that certain Deed of Trust dated 9/7/2005 executed by **JAMES L. RAMPP AND CHAUNTEL M. RAMPP, HUSBAND AND WIFE AS COMMUNITY PROPERTY,** as Trustor(s) to **FREMONT GENERAL CREDIT CORPORATION, A CALIFORNIA CORPORATION,** as Trustee and recorded as Instrument No. **2005-0787005,** on **9/12/2005,** in Book xxx, Page xxx of Official Records, in the office of the County Recorder of **SAN DIEGO** County, **CA** together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Dated: 1/21/2009 10:25 AM



MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FREMONT INVESTMENT & LOAN, A CORPORATION

By: Marti Noriega Assistant Vice President

State of TX         )
County of Harris    )

On 2/13/09 before me, Leigh Blackwell a notary public, personally appeared Marti Noriega , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature Leigh Blackwell (Seal)

LEIGH BLACKWELL
Notary Public, State of Texas
My Commission Expires
March 30, 2011

"EXHIBIT 6"

# U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:11-cv-03017-BTM-NLS

| | |
|---|---|
| Rampp v. Litton Loan Services, et al. et al | Date Filed: 12/27/2011 |
| Assigned to: Judge Barry Ted Moskowitz | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Nita L. Stormes | Nature of Suit: 220 Real Property: |
| Cause: 15:1692 Fair Debt Collection Act | Foreclosure |
| | Jurisdiction: Diversity |

**Plaintiff**

**Chauntel Rampp**                        represented by    **Joseph J. Rego**
                                                            Law Offices of Joseph J Rego
                                                            3443 Camino Del Rio S
                                                            Suite 300
                                                            San Diego, CA 92108
                                                            619-564-8725
                                                            Fax: 619-564-8807
                                                            Email: joerego@regolaw.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Litton Loan Services, et al.**
*TERMINATED: 01/18/2012*

**Defendant**

**OCWEN Loan & Mortgage Service
et al.**
*TERMINATED: 01/18/2012*

**Defendant**

**OCWEN FINANCIAL
CORPORATION**                           represented by    **Bryan Patrick Regan**
                                                            Houser & Allison, APC
                                                            701 Palomar Airport Road
                                                            Suite 200
                                                            Carlsbad, CA 92011
                                                            (760) 603-9664
                                                            Fax: (949) 679-1112
                                                            Email: bregan@houser-law.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Does 1 through 20**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/27/2011 | 1 | COMPLAINT with Jury Demand against Litton Loan Services, et al., OCWEN Loan & Mortgage Service et al. ( Filing fee $ 350 receipt number 974-4299885.), filed by Chauntel Rampp. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit List, # 3 Exhibit B)<br><br>The new case number is 3:11-cv-3017-BTM-NLS. Judge Barry Ted Moskowitz and Magistrate Judge Nita L. Stormes are assigned to the case. (Joseph Reso)(pvm) (Additional attachment(s) added on 12/28/2011: # 4 Exhibit C) (pvm). (cap). (Main Document 1 replaced on 12/29/2011) (pvm). (Attachment 1 replaced on 12/29/2011) (pvm). (Entered: 12/27/2011) |
| 12/27/2011 | 2 | Summons Issued.<br>**Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (pvm) (cap). (Entered: 12/27/2011) |
| 12/29/2011 | 3 | ORDER TO SHOW CAUSE Why Case Should Not Be Dismissed. Plaintiffs written response to this OSC is due on or before January 11, 2012. The OSC is set for hearing on January 13, 2012 at 11:00 a.m. Signed by Judge Barry Ted Moskowitz on 12/29/11.(ecs)(jrd) (Entered: 12/29/2011) |
| 01/10/2012 | 4 | NOTICE by Chauntel Rampp *Notice of Errata and correction of page 2 paragraph 4 of Plainitffs Complaint* (Rego, Joseph) Notified atty re pos (ecs). (Entered: 01/10/2012) |
| 01/10/2012 | 5 | RESPONSE re 3 Order to Show Cause, *Response to OSC set for 01/13/2021 Re: Dismissal filed by Plaintiffs Counsel* filed by Chauntel Rampp. (Rego, Joseph) Notified atty re missing pos(ecs). (Entered: 01/10/2012) |
| 01/13/2012 | 6 | ORDER Continuing Order to Show Cause Why Case Should Not Be Dismissed: Plaintiff may file a supplemental response to the Order to Show Cause by 2/27/2012. The Court continues the OSC Hearing to 3/2/2012 at 11:00 AM. Signed by Judge Barry Ted Moskowitz on 1/13/2012.(All non-registered users served via U.S. Mail Service)(leh)(jrd) (Entered: 01/13/2012) |
| 01/16/2012 | 7 | DECLARATION re 1 Complaint, 2 Summons Issued *Errata and Declaration to file First Amended Complaint prior to service in Conjunction with Court Order and Response to OSC set for 03/02/2012* by Plaintiff Chauntel Rampp. (Rego, Joseph) (knb). (Entered: 01/16/2012) |
| 01/18/2012 | 8 | RESPONSE re 6 Order, Set Hearings,, *to Order to Show Cuase for Dismissal set for 03/02/2012 filed by Plaintiffs Counsel* filed by Chauntel Rampp. (Attachments: # 1 Exhibit)(Rego, Joseph) Notified atty re heading and pos (ecs). (Entered: 01/18/2012) |
| 01/18/2012 | 9 | FIRST AMENDED COMPLAINT against OCWEN FINANCIAL CORPORATION, filed by Chauntel Rampp. (Attachments: # 1 Supplement, # 2 Exhibit, # 3 Exhibit)New Summons Requested. (Rego, Joseph) (ecs). (Entered: 01/18/2012) |

| 01/19/2012 | 10 | First Amended Complaint Summons Issued. **Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (ecs) (Entered: 01/19/2012) |
|---|---|---|
| 01/19/2012 | 11 | ORDER Vacating Order to Show Cause. Signed by Judge Barry Ted Moskowitz on 1/19/12.(ecs)(jrd) (Entered: 01/19/2012) |
| 01/19/2012 | 12 | MOTION for Preliminary Injunction *to Stop Ocwen Financial Corp. from Foreclosure Proceedings andf for Legal Fees and Costs incurred by Plaintiff* by Chauntel Rampp. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration)(Rego, Joseph) Notified atty re incorrect pdf attached (ecs). (Entered: 01/19/2012) |
| 01/19/2012 | 13 | MOTION for Preliminary Injunction *Notice of Motion for Preliniary Injunction* by Chauntel Rampp. (Attachments: # 1 Notice)(Rego, Joseph) Notified atty re incorrect pdf attached (ecs). (Entered: 01/19/2012) |
| 01/21/2012 | 14 | NOTICE OF WITHDRAWAL OF DOCUMENT by Chauntel Rampp *For Documents 12 & 13 and Notice of Intent to Re-file Documents.* (Rego, Joseph) (ecs). (Entered: 01/21/2012) |
| 01/21/2012 | 15 | MOTION for Preliminary Injunction *Memorandum of Points and Authorities in Support of Motion, Declaration of Plaintiff Chauntel Rampp in Support of Motion, Notice of Motion for Preliminary Injunction and Request for Legal Fees and Costs* by Chauntel Rampp. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration, # 3 Notice)(Rego, Joseph) (ecs). (Entered: 01/21/2012) |
| 01/21/2012 | 16 | AFFIDAVIT of Service for First Amended Summons and First Amended Complaint *Filed by Plaintiffs Counsel* served on Ocwen Financial Corp. on 01/23/2012, filed by Chauntel Rampp. (Rego, Joseph) (ecs). (Entered: 01/21/2012) |
| 01/21/2012 | 17 | AFFIDAVIT of Service for Motion for Preliniary Injunction, Notice of Motion, Points and Authorities, Delcaration of Plaintiff *Counsel for Plaintiff/Declaration of Service on Defendant and Agent in Florida for Service of Process by U.S. Mail with Postage Prepaid* served on Ocwen Financial Corp. on 01/23/2012, filed by Chauntel Rampp. (Rego, Joseph) (ecs). (Entered: 01/21/2012) |
| 02/02/2012 | 18 | Joint Motion to Continue Preliminary Hearing set for 03-02-2012 and extension of time to Respond to First Amended Complaint by Chauntel Rampp. (Rego, Joseph)(ecs). (Entered: 02/02/2012) |
| 02/07/2012 | 19 | ORDER on 18 Joint Motion to Continue Preliminary Injunction Hearing. As agreed by the parties, Defendant Ocwen Loan shall respond to the First Amended Complaint on or before March 16, 2012. The hearing on the Motion for Preliminary Injunction is continued to May 4, 2012 at 11:00 a.m. Unless otherwise directed by the Court, there shall be no oral argument, and no personal appearances are necessary. Signed by Judge Barry Ted Moskowitz on 2/6/12. (ecs)(jrd) (Entered: 02/07/2012) |
|  |  |  |

| 03/15/2012 | 20 | NOTICE by Ocwen Financial Corporation *(Motion to Dismiss)* (Attachments: # 1 Memo of Points and Authorities)(Regan, Bryan) Notified atty re wrong event used and no hearing date/time (ecs). (Entered: 03/15/2012) |
| 03/15/2012 | 21 | REQUEST for Judicial Notice by Ocwen Financial Corporation in Support of 20 Motion to Dismiss (Regan, Bryan) (ecs). (Entered: 03/15/2012) |
| 03/15/2012 | 22 | NOTICE by OCWEN FINANCIAL CORPORATION *Amended Notice of Motion to Dismiss to Include Motion Hearing Date re: Doc. No. 20* (Regan, Bryan) (ecs). (Entered: 03/15/2012) |
| 04/19/2012 | 23 | MOTION to Continue *Stipulation to Continue Joint Motion Preliminary Hearing set for 05/04/2012 and Defendant's Motion to Dismiss* by Chauntel Rampp. (Rego, Joseph) (ecs). (Entered: 04/19/2012) |
| 04/23/2012 | 24 | ORDER Granting 23 Joint Motion to Continue. The hearing on the 15 20 Motions is continued to June 8, 2012 at 11:00 a.m. Unless otherwise directed by the Court, there shall be no oral argument, and no personal appearances are necessary. Signed by Judge Barry Ted Moskowitz on 4/23/12. (ecs) (Entered: 04/23/2012) |
| 05/24/2012 | 25 | RESPONSE in Opposition re 15 MOTION for Preliminary Injunction *Memorandum of Points and Authorities in Support of Motion, Declaration of Plaintiff Chauntel Rampp in Support of Motion, Notice of Motion for Preliminary Injunction and Request for Legal Fees and Costs*, 13 MOTION for Preliminary Injunction *Notice of Motion for Prelinary Injunction*, 12 MOTION for Preliminary Injunction *to Stop Ocwen Financial Corp. from Foreclosure Proceedings andf for Legal Fees and Costs incurred by Plaintiff* filed by OCWEN FINANCIAL CORPORATION, OCWEN Loan & Mortgage Service et al.. (Attachments: # 1 Request for Judicial Notice RJN with exhibits 1-6)(Regan, Bryan) (ecs). (Entered: 05/24/2012) |
| 05/24/2012 | 26 | RESPONSE in Opposition re 20 MOTION to Dismiss *Opposition to Motion to Dismiss Filed by Ocwen* filed by Chauntel Rampp. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Proof of Service)(Rego, Joseph) (ecs). (Entered: 05/24/2012) |
| 05/29/2012 | 27 | REPLY to Response to Motion re 12 MOTION for Preliminary Injunction *to Stop Ocwen Financial Corp. from Foreclosure Proceedings andf for Legal Fees and Costs incurred by Plaintiff Plainitff's Reply to Ocwen's Opposition to Motion for Preliminary Injunction Continuend and set for hearing 06/08/2012 11:00 a.m. Courtroom -5- Hon. Moskowitz Presiding* filed by Chauntel Rampp. (Attachments: # 1 Memo of Points and Authorities, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Declaration, # 6 Proof of Service)(Rego, Joseph) (ecs). (Entered: 05/29/2012) |
| 05/29/2012 | 28 | RESPONSE in Support re 20 MOTION to Dismiss filed by OCWEN FINANCIAL CORPORATION, OCWEN Loan & Mortgage Service et al. (Regan, Bryan) (ecs). (Entered: 05/29/2012) |
| 06/01/2012 | 29 | REPLY to Response to Motion re 20 MOTION to Dismiss *Supplemental Response of Counsel Argument in Reponse to Reply to Response in Opposition* filed by Chauntel Rampp. (Rego, Joseph) Notified atty re missing pos (ecs). |

|  |  | (Entered: 06/01/2012) |
|---|---|---|
| 06/04/2012 | 30 | AFFIDAVIT of Service for Reply to Response To Opposition *Proof of Service for Reply to Response to Opposition* served on Bryan Regan Defense Counsel on 06/01/2012, filed by Chauntel Rampp. (Rego, Joseph) (ecs). (Entered: 06/04/2012) |
| 06/08/2012 | 31 | MINUTE ORDER, Motions Submitted 15 MOTION for Preliminary Injunction *Memorandum of Points and Authorities in Support of Motion, Declaration of Plaintiff Chauntel Rampp in Support of Motion, Notice of Motion for Preliminary Injunction and Request for Legal Fees and Costs,* 20 MOTION to Dismiss (rfm) (Entered: 06/11/2012) |
| 06/27/2012 | 32 | SUMMONS Returned Executed by Chauntel Rampp. OCWEN FINANCIAL CORPORATION served. (Rego, Joseph)(rlu). (Entered: 06/27/2012) |
| 07/09/2012 | 33 | NOTICE of Joinder by OCWEN FINANCIAL CORPORATION *to Ocwen Loan Servicing LLC's Motion to Dismiss and Opposition to Plaintiff's Motion for Preliminary Injuction* (Regan, Bryan) qc email re duplicate entry of 34 and signature on pos on 7/9/2012 (rlu). (Entered: 07/09/2012) |
| 07/09/2012 | 34 | NOTICE of Joinder by OCWEN FINANCIAL CORPORATION *to Ocwen Loan Servicing LLC's Motion to Dismiss and Opposition to Plaintiff's Motion for Preliminary Injuction* (Attachments: # 1 Exhibit Exhibit A)(Regan, Bryan) (rlu). (Entered: 07/09/2012) |
| 07/23/2012 | 35 | ORDER Granting In Part and Denying In Part 20 Motion to Dismiss First Amended Complaint: Granting Plaintiff's claims for wrongful foreclosure, Dismissing without prejudice claim for legal fees and sanctions, Striking Paragraphs 12 and 13 of the FAC as well as item 7 in the Prayer for Relief, Denying Plaintiff's claims for specific performance, breach of contract, and injunction; And Granting In Part and Denying In Part 15 MOTION for Preliminary Injunction: Granting preliminary injunction enjoining Ocwen from foreclosing on the Property located at 244 Avalon Drive, Vista, CA 92083, Denying Plaintiff's request for an order requiring Ocwen to pay her attorney's fees. Plaintiff may file an amended complaint within 20 days of the filing of this Order. If no amended complaint is filed, Ocwen must file an answer within 30 days of the filing of this Order. Signed by Judge Barry Ted Moskowitz on 7/23/12.(cc: Financial)(rlu)(jrd) (Entered: 07/23/2012) |
| 08/07/2012 | 36 | Second AMENDED COMPLAINT *Second Amended Complaint and Exhibit List to Support Second Amended Complaint* against OCWEN FINANCIAL CORPORATION, filed by Chauntel Rampp. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Rego, Joseph) qc email re service on 8/8/2012 (rlu). (Entered: 08/07/2012) |
| 08/07/2012 | 37 | AFFIDAVIT of Service for Proof of Service *Proof of Service of Order Issued 07/23/2012 on the Clerk of the Court Per Court Order* served on Clerk of the Court for the Federal District Court on 07/27/2012, filed by Chauntel Rampp. (Rego, Joseph) (rlu). (Entered: 08/07/2012) |
| 08/08/2012 | 38 | ORDER Setting Status Conference on 9/5/2012 at 3:30 PM before Judge Barry Ted Moskowitz. Signed by Judge Barry Ted Moskowitz on 8/8/2012.(rlu)(jrd) |

|            |    | (Entered: 08/08/2012) |
|------------|----|----------------------|
| 08/08/2012 | 39 | AFFIDAVIT of Service for Proof of Service *Affidavit of Service for Docket Entry Number 36 Second Amended Complaint and Exhibit List for Second Amended Complaint* served on Defendant Ocwen on 08/08/2012, filed by Chauntel Rampp. (Rego, Joseph)(yeb). (Entered: 08/08/2012) |
| 08/08/2012 | 40 | AFFIDAVIT of Service for Corrected Proof of Service *for Second Amended Compaint Docket Item 36* served on Ocwen Financial on 08/08/2012, filed by Chauntel Rampp. (Rego, Joseph)(yeb). (Entered: 08/08/2012) |
| 08/22/2012 | 41 | DECLARATION *Affidavit and Verification to Second Amended Complaint* by Plaintiff Chauntel Rampp. (Rego, Joseph) (rlu). (Entered: 08/22/2012) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/24/2012 10:07:32 | | |
| **PACER Login:** | ha0341 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:11-cv-03017-BTM-NLS |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

"EXHIBIT 7"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

CHAUNTEL RAMPP,

                                        Plaintiff,

v.

OCWEN FINANCIAL CORPORATION,
AND DOES 1 THROUGH 20,

                                        Defendants.

Case No. 11cv3017 BTM(NLS)

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FIRST AMENDED COMPLAINT AND GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**

Ocwen Financial Corporation and Ocwen Loan Servicing, LLC (sued as "Ocwen Financial Corporation") (collectively "Ocwen") have filed a motion to dismiss Plaintiff's First Amended Complaint ("FAC")[1]. Plaintiff Chauntel Rampp ("Plaintiff") has filed a motion for preliminary injunction, seeking an order enjoining Ocwen from foreclosing on her property and requiring Ocwen to pay the legal fees she has incurred to date. For the reasons

---

[1] Ocwen Loan Servicing, LLC appears to be a proper party to this action because it is the current servicer of Plaintiff's mortgage. However, Plaintiff did not sue Ocwen Loan Servicing, LLC and names as a defendant Ocwen Financial Corporation. In her Opposition to the Motion to Dismiss, at 3, Plaintiff claims that she intentionally sued Ocwen Financial Corporation because it is the parent company that owns Ocwen Loan Servicing. Plaintiff does not, however, explain why she did not name Ocwen Loan Servicing, LLC, as a defendant and does not set forth the theory under which the parent company would be liable for the actions of the LLC. Ocwen has not moved to dismiss the FAC on this ground and Ocwen Loan Servicing, LLC has made an appearance. Therefore, the Court will not, at this point in time, dismiss the FAC based on Plaintiff's failure to name the proper party or to establish the liability of Ocwen Financial Corporation for the actions of Ocwen Loan Servicing, LLC.

1   discussed below, Ocwen's motion to dismiss is **GRANTED IN PART and DENIED IN PART.**

2   Plaintiff's motion for preliminary injunction is **GRANTED** to the extent Plaintiff seeks to enjoin

3   foreclosure and is **DENIED** to the extent Plaintiff seeks the recovery of legal fees.

4

5                   **I.  FACTUAL BACKGROUND**

6       In this lawsuit, Plaintiff Chauntel Rampp alleges that Ocwen has wrongfully refused

7   to honor a loan modification agreement Plaintiff entered into with the prior loan servicer,

8   Litton Loan Servicing LP ("Litton").

9       On September 7, 2005, James and Chauntell Rampp obtained a loan in the amount

10  of $400,000.00, which was secured by a Deed of Trust on the property located at 244 Avalon

11  Drive, Vista, CA 92083 (the "Property").

12      Also on September 7, 2005, James and Chauntell Rampp obtained a loan in the

13  amount of $100,000, which was secured by a second Deed of Trust on the Property.

14      On January 22, 2009, a Notice of Default was recorded against the Property.  (Def.

15  RJN, Ex. 3.) According to the Notice of Default, the Rampps were in arrears in the amount

16  of $18,956.41.

17      In her verified FAC, Plaintiff states that on April 4, 2011, she entered into a valid

18  contract for the modification of the $400,000 loan.  (FAC ¶ 6.)  Plaintiff states that she

19  complied with all of the conditions of the contract for modification, including making her

20  modified payments on time.  (FAC ¶ 7.)

21      Attached to the FAC is a letter dated January 24, 2011, on Litton Loan Servicing

22  letterhead.  (Ex. A to FAC.) The letter states that it is a "commitment letter" that contains

23  Litton's offer to modify the terms of the $400,000 loan.  The letter sets forth the terms of the

24  modification, including the new principal balance and monthly payment.  The letter states

25  that to accept the offer for a modified mortgage, the Rampps must sign and return the letter

26  by February 7, 2011.  The offer is made by "Prommis Solutions as authorized agent for Litton

27  Loan Servicing LP."  At the end of the letter are terms for "Acceptance of Offer for Modified

28  Mortgage," followed by signature lines under the words: "I/We have had the opportunity to

1  consult with legal and/or tax counsel prior to accepting this offer, and whether or not I/we

2  retained such counsel, I/we have agreed to these terms and conditions." The Rampps

3  signed the letter on January 31, 2011, and presumably returned it by February 7, 2011,

4  resulting in the issuance of a formal loan modification agreement and related documents.

5  (Ex. A to FAC.) These formal documents were signed by the Rampps on April 4, 2011.

6       In a letter dated August 15, 2011 (Ex. B to FAC), the Rampps were notified by Litton

7  that Ocwen Loan Servicing, LLC, was taking over the servicing of the account.  Litton

8  assured the Rampps: "The transfer of the servicing of your account does not affect any term

9  or condition of your financing agreement, other than terms directly related to the servicing

10 of your account."

11      When Ocwen Loan Servicing, LLC, took over the servicing of the loan, it informed

12 Plaintiff that she did not have a valid loan modification.  (FAC ¶ 8.)  In a letter dated

13 September 27, 2011, Ocwen Loan Servicing, LLC, states that according to its records,

14 although the Rampps were approved for a loan modification, they declined the modification

15 offer on August 26, 2011. (Ex. C to FAC.) Plaintiff contends that the agreement had already

16 been finalized by then and that there was no refusal.  (Opp. to Mot. to Dismiss at 2.)  Once

17 Ocwen refused to accept payments under the modified agreement, Plaintiff stopped making

18 the payments and has put them aside.  (Rego Decl. in Opp. to Mot. to Dismiss, 2.)

19      On December 27, 2011, Plaintiff commenced this action.  In her FAC, Plaintiff asserts

20 the following claims: (1) specific performance of contract; (2) breach of contract; and (3)

21 injunctive relief.

22

23                              **II. DISCUSSION**

24      Plaintiff seeks a preliminary injunction, enjoining Ocwen from foreclosing on the

25 Property and requiring Ocwen to pay Plaintiff's legal fees incurred to date.  Ocwen, in turn,

26 has filed a motion to dismiss the FAC for failure to state a claim.  The Court **GRANTS**

27 Plaintiff's motion for preliminary injunction to the extent that it seeks to enjoin foreclosure

28 proceedings but **DENIES** Plaintiff's request for attorney's fees.  The Court **GRANTS IN**

1  **PART** and **DENIES IN PART** Ocwen's motion to dismiss.

2

3  A.  Motion to Dismiss

4       1.  Breach of Contract & Specific Performance

5       Ocwen argues that Plaintiff's claims for specific performance and breach of contract

6  fail because the loan modification agreement does not comply with the statute of frauds.

7  Ocwen argues that the agreement is unenforceable because the agreement is not signed

8  by Ocwen.  The Court does not find this argument to be persuasive.

9       Ocwen is correct that the loan modification agreement is subject to California's statute

10  of frauds, Cal. Civ. Code § 1624.  A mortgage falls within the statute of frauds, and an

11  agreement to modify a contract that is subject to the statute of frauds is also subject to the

12  statute of frauds.  Seacrest v. Security Nat'l Mortg. Loan Trust, 167 Cal. App. 4th 544, 552-

13  53 (2008).

14       However, it appears that the loan modification agreement complies with the statute

15  of frauds.   Under Cal. Civ. Code § 1624, an agreement by a purchaser of real property to

16  pay an indebtedness secured by a mortgage or deed of trust upon the property purchased

17  is invalid "unless [it], or some note or memorandum thereof, are in writing and subscribed

18  by the party to be charged or by the party's agent."  The signature of the party to be charged

19  "need not be manually affixed, but may in some cases be printed, stamped or typewritten"

20  Marks v. Walter G. McCarty Corp., 33 Cal. 2d 814, 820 (1949).  The statute of frauds is not

21  satisfied, however, "unless it is proved that the name relied upon as a signature was placed

22  on the document or adopted by the party to be charged with the intention of authenticating

23  the writing.  In other words the defendant must intend to appropriate the name as a

24  signature."  Id.

25       The commitment letter was on Litton Loan Servicing letterhead.  The letter stated that

26  it was an offer and contained the material terms of the modification.  Although there was no

27  handwritten signature, the offer letter closed with the typed words "Sincerely, Prommis

28  Solutions as authorized agent for Litton Loan Servicing LP."  Based on the evidence before

1  the Court, it appears that Litton did intend to authenticate the writing as an offer from Litton.

2  Therefore, upon the Rampps' acceptance of the offer, the modification agreement became

3  an enforceable contract that satisfies the statute of frauds. See Khan v. America, 2011 WL

4  5079510, at * 4 (N.D. Cal. Oct. 25, 2011) (holding that loan modification agreement letter

5  with Bank of America's electronic signature complied with the statute of frauds).

6       Although Ocwen Loan Servicing, LLC, did not itself sign the modification agreement,

7  it presumably is bound by modification agreements entered into Litton, the prior servicer.

8  In the Notice of Servicing Transfer, Litton even stated, "The transfer of the servicing of your

9  account does not affect any term or condition of your financing agreement . . . . " (Ex. B to

10 FAC.)

11      Having satisfied the statute of frauds, Plaintiff has stated sufficient facts to state a

12 claim for breach of contract and specific performance. The elements of breach of contract

13 are: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance;

14 (3) defendant's breach; and (4) resulting damages to the plaintiff. CDF Firefighters v.

15 Maldonado, 158 Cal. App. 4th 1226, 1239 (2008). To establish a right to specific

16 performance, the plaintiff must establish: (1) the contract terms are sufficiently definite; (2)

17 consideration is adequate; (3) there is substantial similarity of the requested performance

18 to the contractual terms; (4) there is mutuality of remedies; and (5) plaintiff's legal remedy

19 is inadequate. Blackburn v. Charnle, 117 Cal. App. 4th 758, 766 (2004). Plaintiff has stated

20 facts satisfying these elements  -- e.g., the existence of a contract with definite terms,

21 Plaintiff's performance under the contract and reliance on the modification, defendant's

22 breach, identity of the requested performance to the contractual terms, and the need for

23 specific performance so that Plaintiff can retain possession of the Property.

24      Ocwen points out that specific performance is not itself a cause of action, but, rather,

25 a remedy for breach of contract. Golden West Baseball Co. v. City of Anaheim, 25 Cal. App.

26 4th 11, 49 (1994). Although Ocwen is correct, the Court finds it unnecessary to dismiss the

27 specific performance claim on this technical ground.

28

### 2. Injunctive Relief

Ocwen argues that Plaintiff's injunctive relief claim fails because it is premised on the breach of contract and specific performance claims, which also fail. However, as discussed above, the Court finds that Plaintiff has stated claims for breach of contract and specific performance.

The Court discusses Plaintiff's right to injunctive relief in greater detail in Section II.B., infra.

### 3. Wrongful Foreclosure & Unfair Business Practices

The caption page of the FAC lists a claim for wrongful foreclosure. However, the body of the FAC does not include a claim for "wrongful foreclosure."

Paragraphs 22 and 23 of the FAC, under the "Injunctive Relief" heading, refer to violations of Cal. Bus. & Prof. Code § 17200. (FAC ¶¶ 22, 23.) However, the caption page does not list a separate claim under § 17200, and the body of the FAC lacks a separate cause of action under § 17200.

To the extent Plaintiff means to assert claims for wrongful foreclosure and violation of Cal. Bus. & Prof. Code § 17200, the Court dismisses those claims without prejudice for failure to clearly assert the claims and allege facts supporting the claims.

### 4. Attorney's Fees and Sanctions

The caption page lists a claim for "legal fees and sanctions." Paragraphs 12 and 13 of the FAC allege that Ocwen should pay legal fees, costs, and sanctions, because Plaintiff's counsel has spent numerous hours meeting and conferring regarding the issues in this lawsuit. The Prayer for Relief also requests "legal fees and sanctions" in the amount of $180,000.00.

Generally, breach of contract damages do not include attorney's fees. Under Cal. Civ. Code § 1717, attorney's fees are recoverable by the prevailing party on a contract claim where the contract <u>specifically</u> provides for such relief. Under California law, unless

1  authorized by statute or agreement, attorney's fees ordinarily are not recoverable as costs.

2  Reynolds Metals Co. v. Alperson, 25 Cal. 3d 124, 128 (1979).

3       Plaintiff has not identified a contractual term or statute that provides for the recovery

4  of attorney's fees in this case.  Nor has Plaintiff identified the legal authority for awarding

5  "sanctions."  Therefore, the Court dismisses Plaintiff's claim for "legal fees and sanctions."

6  The Court strikes Paragraphs 12 and 13 of the FAC as well as item 7 in the Prayer for Relief.

7

8  B.  Motion for Preliminary Injunction

9       Plaintiff seeks a preliminary injunction enjoining Ocwen from taking any further action

10  to foreclose on the Property.  Plaintiff also asks the Court to order Ocwen to pay the legal

11  fees incurred by Plaintiff to date.  For the reasons discussed above, Plaintiff has not shown

12  that she is entitled to attorney's fees.  Therefore, the Court denies Plaintiff's request for

13  attorney's fees.  However, the Court will grant a preliminary injunction enjoining Ocwen from

14  taking any further action to foreclose on the Property.

15       To prevail on a motion for a preliminary injunction, the moving party must establish

16  (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm

17  in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4)

18  that an injunction is in the public interest.  Winter v. Natural Res. Defense Council, Inc., 555

19  U.S. 7, 20 (2008).  The Ninth Circuit has also articulated an alternate formulation of the

20  Winter test under which "'serious questions going to the merits' and a balance of hardships

21  that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long

22  as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction

23  is in the public interest."  Farris v. Seabrook, 677 F.3d 848, 864 (9th Cir. 2012) (quoting

24  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011))

25       Based on the record before the Court, it appears that Plaintiff has raised serious

26  questions going the merits.  There is evidence that Plaintiff entered into an enforceable loan

27  modification agreement with Litton and performed under the modified agreement.  There is

28  also evidence that Ocwen has refused to honor the loan modification agreement, even

1   though it assumed the rights and obligations of the prior servicer. Accordingly, Plaintiff may

2   very well prevail on her claims for breach of contract and specific performance.

3          Absent injunctive relief, Plaintiff is likely to suffer irreparable harm in the form of loss

4   of her Property.  Any pecuniary harm that may be suffered by Ocwen as a result of the

5   injunction can be counterbalanced by ordering that Plaintiff post a bond. Thus, the balance

6   of equities tips in favor of granting injunctive relief.

7          An injunction is also in the public interest because it furthers the goals of protecting

8   borrowers' rights and preventing improper foreclosures.

9          Therefore, The Court grants Plaintiff's motion for a preliminary injunction. The Court

10  determines that the proper amount of the bond is the modified monthly payment ($2,391.41)

11  that is due from this point going forward.  In order for the injunction to remain in effect, every

12  month (on the first of the month or the first business day after if the first falls on a weekend

13  or court holiday), Plaintiff must deposit with the Clerk of the Court a payment in cash or

14  certified check in the amount of $2,391.41. Each payment must identify this case. If Plaintiff

15  fails to post the security within the required time, Defendant may file a notice notifying the

16  Court of Plaintiff's failure to comply.  The deposits shall serve as a bond for the issuance of

17  the preliminary injunction.

18

19                               III. **CONCLUSION**

20         For the reasons discussed above, Ocwen's motion to dismiss [Doc. No. 20] is

21  **GRANTED IN PART and DENIED IN PART.** Ocwen's motion is **GRANTED** as to Plaintiff's

22  claims for wrongful foreclosure, violation of Cal. Bus. & Prof. Code §17200 (to the extent that

23  Plaintiff intends to assert such a claim), and  claim for legal fees and sanctions, which are

24  **DISMISSED WITHOUT PREJUDICE.**  The Court **STRIKES** Paragraphs 12 and 13 of the

25  FAC as well as item 7 in the Prayer for Relief. Ocwen's motion is **DENIED** as to Plaintiff's

26  claims for specific performance, breach of contract, and injunction. If Plaintiff chooses to do

27  so, she may file an amended complaint within 20 days of the filing of this Order.  If no

28  amended complaint is filed, Ocwen must file an answer within 30 days of the filing of this

1 | Order.

2 |      Plaintiff's motion for a preliminary injunction [Doc. No. 15] enjoining Ocwen from

3 | foreclosing on her Property is **GRANTED**. Plaintiff's request for an order requiring Ocwen

4 | to pay her attorney's fees incurred to date is **DENIED**.

5 |      The Court preliminarily **ENJOINS** Ocwen Financial Corporation and Ocwen Loan

6 | Servicing, LLC, and their agents, servants, employees, and all persons in active concert or

7 | participation with any of them, from foreclosing on the property located at 244 Avalon Drive,

8 | Vista, CA 92083.

9 |      In order for the preliminary injunction to remain in effect, every month (on the first of

10 | the month or the next court business day if the first falls on a weekend or court holiday),

11 | beginning August 1, 2012, Plaintiff must make the required payment of $2,391.41 to the

12 | Clerk of the Court.

13 |      The Clerk shall place all payments made pursuant to this Order in an interest-bearing

14 | money market account. The Clerk shall assess a charge for the handling of the funds in

15 | accordance with the fee schedule issued by the Director of the Administrative Office of the

16 | U.S. Courts.

17 |      Pursuant to CivLR 67.1.d., **IT IS ORDERED** that Plaintiff's counsel personally serve

18 | a copy of this Order on the Clerk or the Chief Deputy. Absent the aforesaid service, the

19 | Clerk is hereby relieved of any personal liability relative to compliance with this order.

20 | **IT IS SO ORDERED.**

21 | DATED: July 23, 2012

22 |

23 | BARRY TED MOSKOWITZ, Chief Judge
United States District Court

24 |

25 |

26 |

27 |

28 |